

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GAIL JOHNSON, BYRON TREADWELL NATALIE MCFALL, FREDERICK TARVER, and CANDICE MCGEE, <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF CHICAGO, et al <br><br> Defendants. | No. 03 C 6620 <br><br> Judge Hart <br><br> Magistrate Judge Keys |

### DEFENDANT DAVIS'S ANSWER TO PLAINTIFFS' THIRD AMENDED COMPLAINT

NOW COMES Defendant, WILLIAM DAVIS, by and through his attorneys Pugh, Jones, Johnson & Quandt, P.C., and in Answer to Plaintiffs' Third Amended Complaint states as follows:

### INTRODUCTION

1. This is a civil rights action pursuant to 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments to the United States Constitution seeking damages for injuries to the plaintiffs caused by the policy and practice of the City of Chicago's Police Department (sometimes hereinafter referred to as the "Police") of detaining Chicago citizens who are witnesses in a criminal investigation and then holding them for many hours against their will in Chicago police station interrogation rooms, even though the Police have no probable cause to suspect these persons of any criminal wrongdoing. The Police engage in this practice, principally in high profile or "heater" investigations, in order to coerce and intimidate these persons into providing information the Police believe they may have. The Police policy flagrantly disregards the Fourth Amendment rights of these citizens to be free of unreasonable search and seizure.

ANSWER: Defendant admits that this cause of action is brought under the Fourth and Fourteenth Amendment. Defendant denies each and every remaining allegation in paragraph 1.

### JURISDICTION AND VENUE

2. This is a civil action arising under 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments of the United States Constitution. This Court has jurisdiction pursuant to 28

1

U.S.C. §§1331 and 1343. Venue in this Court is proper pursuant to 28 U.S.C. §1391(b) because all defendants reside in this District.

ANSWER: Defendant admits this is a civil action purporting to be brought under 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments of the Untied States Constitution. Defendant admits this Court has jurisdiction and that venue is proper in this District.

## **PARTIES**

3. Plaintiff Gail Johnson is an Illinois citizen and a resident of Chicago, Illinois.

ANSWER: Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 3, and, therefore, denies the same and demands strict proof thereof.

4. Plaintiff Natalie McFall is an Illinois citizen and a resident of Chicago, Illinois.

ANSWER: Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 4, and, therefore, denies the same and demands strict proof thereof.

5. Plaintiff Byron Treadwell is an Illinois citizen and a resident of Chicago, Illinois.

ANSWER: Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5, and, therefore, denies the same and demands strict proof thereof.

6. Plaintiff Frederick Tarver is an Illinois citizen and a resident of Chicago, Illinois.

ANSWER: Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 6, and, therefore, denies the same and demands strict proof thereof.

7. Plaintiff Candice McGee is an Illinois citizen and a resident of Chicago, Illinois.

ANSWER: Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 7, and, therefore, denies the same and demands strict proof thereof.

8. Defendant City of Chicago (the "City") is an Illinois municipal corporation located within the Northern District of Illinois. The City operates the Chicago Police Department.

ANSWER: Defendant admits the allegations in paragraph 8.

9.  Defendant Phil Cline is the current Superintendent of the Chicago Police Department. Prior to becoming Superintendent, for some of the time period relevant to this complaint, Cline was Chief of the Police Department's Detective Division. Cline is sued in his individual capacity.

ANSWER: Defendant admits Phil Cline is the current Superintendent of the Chicago Police Department and that plaintiff sues him in his individual capacity. Defendant denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and, therefore, denies the same.

10.  Defendant Terry G. Hillard was formerly Superintendent of the Chicago Police Department and served in that capacity until August 15, 2003, during some of the time period relevant to this complaint. Hilliard is sued in his individual capacity.

ANSWER: Defendant admits Terry G. Hillard was formerly Superintendent of the Chicago Police Department and that plaintiff sues him in his individual capacity.

11.  Defendant Chicago Police Officers Scott (Star No. 21266), Blackledge (Star No. 21203), Gray (Star No. 20612), Hightower (Star No. 21307), Mason (Star No. 20702); Milz (Star No. 21200); Easter (Star No. 20017); Frazier (Star No. 20476); McKenzie (Star No. 6607); Collado (Star No. 19285); Payne (Star No. 5963); Armstrong (Star No. 5053); Howard (Star No. 2337); Michael Conway (Star No. 20246); Mark Regal (Star No. 20502); E. Dawson (Star No. 19891); Gregory Danz (Star No. 20111); William Davis (Star No. 20166); Harry Fenner (Star No.20625); J. Weitzman (Star No. 20307); J. Kane (Star No. 21334); A. Lee (Star No. 20945); L. Thezan (Star No.20880); J. Evans (Star No.21158); Joseph O'Carroll (Star No.20805); J. Lopez (Star No. 20890); Gary Bush (Star No. 20082); Charles Daley (Star No. 20049); W. Ruck (Star No. 20989); P. O'Donovan (Star 20234); James Egan (Star No. 21276); Edward Carroll (Star No. 20346); John Haniacek (Star No. 20713); Kevin Bor (Star No. 20533) and Chicago Police Sergeants Walsh, Howard and Holy are all sworn officers of the Police who are sued in their individual capacities for actions they took by virtue of their authority as Police officers.

ANSWER: Defendant DAVIS admits that he is an officer employed by the City of Chicago. Defendant denies the remaining allegations because they are legal conclusions or are not directed at this answering defendant.

12.  Defendant Chicago Police Officers John Doe One through Six are all sworn officers of the Police whose names and star numbers are not now known to plaintiffs. John Does One through Two are sued in their individual capacities for actions they took by virtue of their authority as Police officers.

ANSWER: The Defendant is without sufficient information to admit or deny the allegations and therefore denies the allegations and demands strict proof thereof.

13.  All of the defendants named above were, at all times material to this Complaint, acting under color of state law and their actions constituted state action.

3

ANSWER: Defendant denies the allegations of this paragraph as they are legal conclusions of the pleader.

## ALLEGATIONS OF FACT

### The Detention of Gail Johnson

14. On or about December 17, 2001, one Michael Lockhart was murdered in the front room of an apartment at 6154 South Martin Luther King Drive in the City. At no time did any of the defendants have a warrant, or probable cause or any other basis to detain Ms. Johnson as a suspect in the murder of Lockhart or for any other reason.

ANSWER: The allegations of paragraph 14 are not directed at this answering defendant, and therefore, no response is required.

15. At approximately 7:00 p.m. on December 17, two Chicago police officers informed Ms. Johnson that it would be necessary for her to come to police headquarters for "a few minutes" for questioning as a witness to Lockhart's murder. Those police officers placed Ms. Johnson in a police car and transported her to Police Area 2 police headquarters.

ANSWER: The allegations of paragraph 15 are not directed at this answering defendant, and therefore, no response is required.

16. At Area 2, Ms. Johnson was thoroughly searched. Her personal identification was removed from her pocket and the shoelaces were taken from her shoes. She was placed in a small, windowless interrogation room furnished only with a metal bunk bolted to the wall, which lacked a toilet or running water. The door to the room was locked from the outside.

ANSWER: The allegations of paragraph 16 are not directed at this answering defendant, and therefore, no response is required.

17. Ms. Johnson remained in this interrogation room throughout the night of December 17-18 and through the day of December 18, until approximately 10:30 p.m. on December 18 - a total of approximately 27 hours.

ANSWER: The allegations of paragraph 17 are not directed at this answering defendant, and therefore, no response is required.

18. During this time, Ms. Johnson was periodically interrogated by one or both of defendants Blackledge and Scott. Ms. Johnson repeatedly asked defendants Blackledge and Scott to allow her to leave, informing those defendants that she was tired and hungry and wanted to go home. The defendants refused. They told Ms. Johnson that she could not leave until an Assistant State's Attorney had conducted an interview of her.

ANSWER: The allegations of paragraph 18 are not directed at this answering defendant, and therefore, no response is required.

19. After Ms. Johnson was taken to the Police headquarters, her brother called First Defense Legal Aid ("FDLA"), a non-profit legal aid organization that provides representation for indigent persons being detained at Police stations, and arranged for an attorney to represent Ms. Johnson. FDLA sent a volunteer attorney to Area 2 to meet with Ms. Johnson and advise her concerning her legal rights.

ANSWER: The allegations of paragraph 19 are not directed at this answering defendant, and therefore, no response is required.

20. Defendant Sergeant Walsh and defendant Blackledge refused to permit the FDLA attorney to see or speak with Ms. Johnson. Those defendants falsely informed the FDLA attorney that Ms. Johnson "wanted to remain" at Police headquarters in order to give a statement.

ANSWER: The allegations of paragraph 20 are not directed at this answering defendant, and therefore, no response is required.

### The Detention of Natalie McFall

21. On or about October 27, 2002, one Walter Givens was murdered in the City of Chicago. At no time did any of the defendants have a warrant, or probable cause or any other bases to detain Ms. McFall as a suspect in the murder of Givens or for any other reason.

ANSWER: The allegations of paragraph 21 are not directed at this answering defendant, and therefore, no response is required.

22. On or about October 28 at approximately 11:00 p.m., defendants Mason and Milz appeared at Ms. McFall's home and told her that she would have to come with them for questioning concerning the murder. Defendants Mason and Milz then transported Ms. McFall to the Area 5 police headquarters.

ANSWER: The allegations of paragraph 22 are not directed at this answering defendant, and therefore, no response is required.

23. At Area 5, Ms. McFall was placed in a small, windowless interrogation room, furnished only with a metal bench and a metal bar, both fastened to the wall, that lacked a toilet or running water. The door to the room was locked from the outside.

ANSWER: The allegations of paragraph 23 are not directed at this answering defendant, and therefore, no response is required.

24. Defendants Mason and Milz interrogated Ms. McFall concerning the murder over the course of many hours. During breaks in the interrogation, Ms. McFall was locked alone in the room described in the preceding paragraph for lengthy periods of time; despite her pleas, the

defendants refused to unlock the door in order to allow her to use the bathroom. Ms. McFall repeatedly told the defendants that she wanted to go home or at least to be permitted to call her mother. The defendants refused both requests.

ANSWER: The allegations of paragraph 24 are not directed at this answering defendant, and therefore, no response is required.

25. After lengthy interrogation, defendants Mason and Mills transported Ms. McFall to the Harrison and Kedzie police headquarters and administered a polygraph. They told her she had failed the examination, placed her in handcuffs and informed her she would be charged as an accessory to murder unless she told them the truth. Ms. McFall was then returned to Area 5.

ANSWER: The allegations of paragraph 25 are not directed at this answering defendant, and therefore, no response is required.

26. After Ms. McFall had been detained, her aunt called FDLA to arrange for an attorney to represent Ms. McFall. An FDLA attorney first telephoned and then went to Area 5 to speak with Ms. McFall. The attorney was advised that he could not speak with her because she was a "witness" whom the Police did not expect to charge.

ANSWER: The allegations of paragraph 26 are not directed at this answering defendant, and therefore, no response is required.

27. Ms. McFall was not released until approximately 2:00 a.m. on Thursday, October 31 - approximately 51 hours after her initial detention.

ANSWER: The allegations of paragraph 27 are not directed at this answering defendant, and therefore, no response is required.

### The Detention of Byron Treadwell

28. On or about June 16, 2003, one Jesse Shepherd was killed during an altercation in front of 11743 South Union in the City of Chicago. At no time did any of the defendants have a warrant, or probable cause of any other basis to detain Mr. Treadwell as a suspect for any crime in connection with the homicide of Jesse Shepherd or for any other reason.

ANSWER: The allegations of paragraph 28 are not directed at this answering defendant, and therefore, no response is required.

29. On or about June 16, 2003 at approximately 6:00 p.m., during the investigation of this homicide, defendant McKenzie, Collado, Payne, Armstrong, and Howard handcuffed Mr. Treadwell and placed him in a paddy wagon. Thereafter, they released him from the handcuffs and informed him that he would have to come to the police station for questioning concerning the homicide. Mr. Treadwell's shoes were removed and one or more of defendants McKenzie, Collado, Payne, Armstrong, and Howard transported Mr. Treadwell to the Area 2 police headquarters.

ANSWER: The allegations of paragraph 29 are not directed at this answering defendant, and therefore, no response is required.

30. At Area 2, Mr. Treadwell was placed in a small, windowless interrogation room, furnished only with a metal bench and a metal bar, both fastened to the wall, that lacked a toilet or running water. Initially, Mr. Treadwell was handcuffed to the wall of the room. The door to the room was locked from the outside.

ANSWER: The allegations of paragraph 30 are not directed at this answering defendant, and therefore, no response is required.

31. Chicago Police Detectives Gray, Hightower and John Does Five and Six interrogated Mr. Treadwell concerning the homicide intermittently over the course of many hours. During the interrogation, these defendants threatened Mr. Treadwell that he would be kept in jail unless he provided them with information concerning the homicide. They gave Mr. Treadwell nothing to eat until hours after his arrival at Area 2. Despite Mr. Treadwell's pleas that he was "slow" and that he wanted to go home, the defendants refused to allow him to leave, telling him that he would have to remain until they got to the bottom of what happened.

ANSWER: The allegations of paragraph 31 are not directed at this answering defendant, and therefore, no response is required.

32. After Mr. Treadwell was detained, his mother called FDLA to arrange for a lawyer to represent him. An FDLA attorney went to Area 2 and requested to meet with Mr. Treadwell. Defendants Howard, Gray and Hightower refused to allow the attorney to meet with Mr. Treadwell, telling the attorney that he was a "witness" and had not requested to speak with counsel.

ANSWER: The allegations of paragraph 32 are not directed at this answering defendant, and therefore, no response is required.

33. In the afternoon of June 17, the defendants transported Mr. Treadwell to the grand jury hearing room at the criminal courts building at 26th and California. The defendants finally allowed Mr. Treadwell to go home following his testimony before the grand jury - close to 24 hours following his initial detention.

ANSWER: The allegations of paragraph 33 are not directed at this answering defendant, and therefore, no response is required.

## The Detention of Frederick Tarver

34. On or about October 18, 2003, an individual known to plaintiffs as Albert Counsel was murdered at 5816 North Ridge Avenue in the City of Chicago. At no time did any of the defendants have a warrant or probable cause to detain Mr. Tarver as a suspect in connection with the homicide of Counsel or for any other reason.

ANSWER: Defendant denies the allegations contained in paragraph 34.

35. At approximately 1:15 a.m. on October 18, Chicago Police Officer Jane Doe told Mr. Tarver that it would be necessary for him to come to a Chicago Police station for questioning concerning the murder of Counsel. Defendant Dawson then transported Mr. Tarver to the 20th District Police station, where he was asked to empty his pockets and was searched. Defendant Dawson then transported Mr. Tarver to the Area 3 Police headquarters at Belmont and Western.

ANSWER: The allegations of paragraph 35 are not directed at this answering defendant, and therefore, no response is required.

36. At Area 3, one or more of defendants Danz, Davis, Fenner, and Weitzman placed Mr. Tarver in a small, windowless interrogation room, furnished only with a chair and a wooden bench bolted to the wall that lacked a toilet or running water. The door to the room was locked from the outside.

ANSWER: Defendant denies the allegations of paragraph 36.

37. Mr. Tarver was interrogated by defendants Danz, Davis, Fenner, and Weitzman for many hours concerning his ability to identify the persons responsible for Counsel's murder. The questioning became increasingly hostile as Mr. Tarver continued to insist that he would only be able to identify one of the two attackers. Mr. Tarver repeatedly asked for permission to leave and was repeatedly told that he would have to stay until the police and an Assistant State's Attorney had completed their interviews of him. The defendants gave Mr. Tarver no food and only a little bit of water to drink during the period of his detention.

ANSWER: Defendant admits that he interviewed Mr. Tarver and denies the remaining allegations of paragraph 37.

38. The defendants ultimately permitted Mr. Tarver to leave the Belmont and Western headquarters at approximately 8:00 p.m. on October 18 – some 19 hours following his initial detention.

ANSWER: Defendant denies the allegations of paragraph 38.

39. In the days and weeks following October 18, Mr. Tarver received repeated and increasingly harassing telephone and in-person contact from defendant Conway Fenner, Kane, Lee and other Chicago Police officers demanding that he come to the Police headquarters for

8

further questioning. Mr. Tarver repeatedly stated that he had nothing further to tell the police and refused these demands.

ANSWER: Defendant denies the allegations of paragraph 39.

40. On December 1, 2003, at approximately 8:00 p.m., one or more defendants Conway, Regal, O'Carroll, Thezan, Evans, John Does One through Four forcibly entered Mr. Tarver's residence with guns drawn and took him in handcuffs to the Area 3 headquarters at Belmont and Western. As before, the Police did not have a warrant or probable cause to suspect Mr. Tarver of any crime in connection with the murder of Counsel or any other offense.

ANSWER: The allegations of paragraph 40 are not directed at this answering defendant, and therefore, no response is required.

41. At Belmont and Western, Mr. Tarver was again held overnight in a small, windowless, locked interrogation room against his will for a total of approximately ten hours. Mr. Tarver was released the following morning at approximately 6:00 a.m., after viewing of a line up. During that evening and night, Mr. Tarver was again interrogated by one or more of defendants Conway, Thezan, O'Carroll, Lee and Evans.

ANSWER: Defendant denies the allegations of paragraph 41.

### The Detention of Candice McGee

42. On or about January 30, 2004 there was a shooting in the vicinity of Independence and Roosevelt in the City that resulted in the death of an individual known to the plaintiffs as "Kemo." At no time did nay of the defendants have a warrant or probable cause or any other basis to detain Ms. McGee as a suspect in this shooting, or for any other reason.

ANSWER: The allegations of paragraph 42 are not directed at this answering defendant, and therefore, no response is required.

43. On or about February 4, 2004 at approximately 10:00 p.m. one or more of the defendants Lopez, Bush, Daley, Ruck, O'Donovan, and Bor entered Ms. McGee's home and told her she would have to come with them. These defendants then transported Ms. McGee to the Area 4 police headquarters.

ANSWER: The allegations of paragraph 43 are not directed at this answering defendant, and therefore, no response is required.

44. At Area 4, Ms. McGee was placed in a small, cinderblock interrogation room furnished only with a long table and two chairs, which lacked a toilet or running water. The door to the room was locked from the outside.

ANSWER: The allegations of paragraph 44 are not directed at this answering defendant, and therefore, no response is required.

9

45. Ms. McGee remained in this interrogation room throughout the night of February 4-5 and through the morning of February 5, until approximately 3:45 p.m. on February 5 – a total of approximately 18 hours.

ANSWER: The allegations of paragraph 45 are not directed at this answering defendant, and therefore, no response is required.

46. During this time, Ms. McGee was periodically interrogated by one or more of defendants Sergeant Holy, Lopez, Bush, Ruck, Egan, Carroll, Haniacek, and Bor. Ms. McGee repeatedly asked these defendants to leave, explaining that she had a child at home who was sick. The defendants refused to allow her to leave. Ms. McGee asked for a lawyer and was told she would not be getting one.

ANSWER: The allegations of paragraph 46 are not directed at this answering defendant, and therefore, no response is required.

47. After Ms. McGee was taken to police headquarters, a friend called FDLA and arranged for an attorney to represent Ms. McGee. FDLA sent two attorneys to Area 4 to meet with Ms. McGee and advise her concerning her legal rights.

ANSWER: The allegations of paragraph 47 are not directed at this answering defendant, and therefore, no response is required.

48. Defendant Sergeant Holy refused to permit the FDLA attorneys to see or speak with Ms. McGee, stating that Ms. McGee was just a witness and that the police would not allow the attorneys to speak with her and would not tell Ms. McGee that the attorneys were there.

ANSWER: The allegations of paragraph 48 are not directed at this answering defendant, and therefore, no response is required.

### The City of Chicago's Policy, Practice and Custom

49. The City maintains a policy, practice and custom of detaining persons whom the Police believe are witnesses to certain crimes for extended periods of time against their will and confining them in locked interrogation rooms at police stationhouses.

ANSWER: The allegations of paragraph 49 are not directed at this answering defendant, and therefore, no response is required, and defendant denies each and every allegation to the extent that they may be construed as directed at this answering defendant.

50. At a hearing conducted before a federal District Judge in *First Defense Legal Aid v. City of Chicago*, No. 01 C 9671, the federal court found, based primarily on admissions by high ranking members of the Police, that the City's policy includes the following:

10

(a) Witnesses are taken to police stations for questioning and are thoroughly searched and are then "secured" by being locked in small, windowless interrogation rooms, which lack toilet facilities or running water and are typically furnished only with a metal bench bolted to the wall.

(b) Witnesses typically remain in such rooms for many hours and in some cases for days.

(c) Counsel for such witnesses who appear at the police station asking to speak with them are refused access to their clients.

(d) Witnesses are confined in these conditions in order to "overcome their reluctance" to cooperate with the police.

(e) Witnesses confined in these conditions are not free to leave the police stationhouses and are, in fact, confined there against their will.

ANSWER: The allegations of paragraph 50 are not directed at this answering defendant, and therefore, no response is required, and defendant denies each and every allegation to the extent that they may be construed as directed at this answering defendant. Further answering, Defendant states that the findings relied on by the Plaintiffs were reversed by the Seventh Circuit's ruling in *First Defense Legal Aid v. City of Chicago*, et al., 319 F.3d 967 (7th Cir. 2003).

51. The policy, practice and custom of the City described in the preceding paragraph is widespread, permanent and well-settled. This policy, practice and custom was vigorously defended by City attorneys in *First Defense Legal Aid v. City of Chicago*.

ANSWER: The allegations of paragraph 51 are not directed at this answering defendant, and therefore, no response is required, and defendant denies each and every allegation to the extent that they may be construed as directed at this answering defendant.

52. The policy, practice and custom of the City complained of herein caused the unlawful seizure and detention of Ms. Johnson and Ms. McFall and has caused the unlawful detention of numerous other citizens.

ANSWER: The allegations of paragraph 52 are not directed at this answering defendant, and therefore, no response is required, and defendant denies each and every allegation to the extent that they may be construed as directed at this answering defendant.

53. The City and the remaining defendants herein acted with deliberate indifference to the rights of the plaintiffs in maintaining and implementing the policy, practice and custom complained of herein.

ANSWER: The allegations of paragraph 53 are not directed at this answering defendant, and therefore, no response is required, and defendant denies each and every allegation to the extent that they may be construed as directed at this answering defendant.

### Supervisory Liability of Defendants Cline and Hillard

54. Defendants Cline and Hillard caused and participated in the deprivations of the plaintiffs' constitutional rights as alleged above. Defendants Cline and Hillard knew that there was and is a widespread and settled practice on the part of Chicago Police Detectives of detaining Chicago citizens who are witnesses in a criminal investigation and then holding them for many hours against their will in Chicago police station interrogation rooms, even though the Police have no probable cause suspect these persons of any criminal wrongdoing.

ANSWER: The allegations of this paragraph are not directed at this answering defendant, and therefore, no response is required, and defendant denies each and every allegation to the extent that they may be construed as directed at this answering defendant.

55. Cline and Hillard approved and facilitated this systemic denial of the constitutional rights of witnesses, including the plaintiffs named herein, by, among other things, (a) failing to discipline Detectives who engage in this practice; (b) providing no training regarding the illegality of this practice; and (c) turning a blind eye to repeated and systemic abuses of the rights of witnesses by locking them for extended periods of time in interrogation rooms without probable cause.

ANSWER: The allegations of this paragraph are not directed at this answering defendant, and therefore, no response is required, and defendant denies each and every allegation to the extent that they may be construed as directed at this answering defendant.

56. Cline and Hillard have explicitly condoned and defended this practice. Cline's defense of the practice has included testifying in support of the practice in the federal District Court in the First Defense Legal Aid case referred to above.

ANSWER: The allegations of this paragraph are not directed at this answering defendant, and therefore, no response is required, and defendant denies each and every allegation to the extent that they may be construed as directed at this answering defendant.

### COUNT I
### (Plaintiff Johnson)

The allegations of this Count are not directed at this answering defendant, and therefore, no response is required, and defendant denies each and every allegation to the extent that they may be construed as directed at this answering defendant.

### COUNT II
### (Plaintiff McFall)

The allegations of this Count are not directed at this answering defendant, and therefore, no response is required, and defendant denies each and every allegation to the extent that they may be construed as directed at this answering defendant.

## COUNT III
### (Plaintiff Treadwell)

The allegations of this Count are not directed at this answering defendant, and therefore, no response is required, and defendant denies each and every allegation to the extent that they may be construed as directed at this answering defendant.

## COUNT IV
### (Plaintiff Tarver)

67. Plaintiff Frederick Tarver repeats and realleges all prior paragraphs as if fully set forth herein.

ANSWER: Defendant repeats and incorporates by reference his answers to all prior paragraphs as if fully set forth herein.

68. Plaintiff Frederick Tarver asserts this Count IV against defendant Cline, defendant Chicago Police Officers Regal, Conway, Kane, Dawson, Davis, Fenner, Lee, Weitzman, O'Carroll, Thezan, Evans, and John Does One through Four in their individual capacities and against the City. Count IV arises under 42 U.S.C. § 1983.

ANSWER: Defendant admits that plaintiff Tarver purports to bring this action against defendant under 42 U.S.C. §1983 and denies all remaining allegations of paragraph 68.

69. The defendants named in the preceding paragraph violated plaintiff's right to be free of unreasonable seizures and detentions as guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States and his right to Due Process as guaranteed by the Fourteenth Amendment to the Constitution of the United States.

ANSWER: Defendant denies each and every allegation of paragraph 69.

70. As a direct and proximate result of the defendants' unlawful conduct as alleged herein, plaintiff suffered fear, humiliation, physical deprivation and other pain and suffering.

ANSWER: Defendant denies each and every allegation of paragraph 70.

71. Defendants' actions were intentional, willful, and exhibited a conscious disregard or reckless indifference to Mr. Tarver's rights.

ANSWER: Defendant denies each and every allegation of paragraph 71.

## COUNT V
### (Plaintiff McGee)

The allegations of Count V are not directed at this answering defendant, and therefore, no response is required, and defendant denies each and every allegation to the extent that they may be construed as directed at this answering defendant.

WHEREFORE, Defendant WILLIAM DAVIS respectfully requests this Court enter judgment in his favor and against plaintiffs, deny all relief to the plaintiffs, including damages and attorney's fees, and to dismiss the Complaint with prejudice and costs.

### FIRST AFFIRMATIVE DEFENSE

NOW COMES the defendant, WILLIAM DAVIS, and as his first affirmative defense states:

1. Defendant is entitled to qualified immunity for the claimed constitutional violations under 42 U.S.C. section 1983 as a reasonable police officer performing discretionary functions because, objectively viewing the facts and circumstances that defendant encountered, could have believed his actions to be lawful in light of clearly established law and the information DAVIS possessed.

2. Defendant is entitled to all privileges and immunities granted pursuant to Federal law.

### SECOND AFFIRMATIVE DEFENSE

NOW COMES the defendant, WILLIAM DAVIS, and as his second affirmative defense states:

1. An award of punitive damages would deprive defendant DAVIS of due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution where:

(A)  liability for punitive damages has not been proven beyond a reasonable doubt, or at least by clear and convincing evidence.

(B)  The award of punitive damages is disproportionate to actual damages.

(C)  To be entitled to punitive damages, the imprisonment must be effected recklessly, oppressively, insulting, or willfully and maliciously.

### THIRD AFFIRMATIVE DEFENSE

NOW COMES the defendant, WILLIAM DAVIS, and as his third affirmative defense states:

1.  At all times during the events alleged in Plaintiffs' Third Amended Complaint, defendant DAVIS acted in accordance with the policies and procedures of the Chicago Police Department in effect at that time. Thus, DAVIS is entitled to qualified immunity for his actions and was not acting in his individual capacity.

### FOURTH AFFIRMATIVE DEFENSE

NOW COMES the defendant, WILLIAM DAVIS, and as his fourth affirmative defense states:

1.  At all times during the events alleged in Plaintiffs' Third Amended Complaint, defendant DAVIS acted in accordance with the laws in effect at that time. Thus, it was not illegal or prohibited by law for DAVIS to deny any legal counsel to any witness who did not request legal counsel.

## **JURY DEMAND**

Defendant demands a jury trial.

WHEREFORE, Defendant WILLIAM DAVIS respectfully requests this Court enter judgment in his favor and against plaintiffs, **deny all** relief to the plaintiffs, including damages and attorney's fees, and to dismiss the Third Amended Complaint with prejudice and costs.

**Respectfully submitted,**

By: *[signature]*
One of Defendant's Attorneys

Walter Jones, Jr.
Stephen H. Pugh
John M. Broderick
Pugh, Jones, Johnson & Quandt, P.C.
180 N. LaSalle Street, Suite 3400
Chicago, IL 60601-2700
(312) 551-1002

## CERTIFICATE OF SERVICE

I, the undersigned attorney, hereby certify that I caused a true and correct copy of the attached **Defendant, William Davis's Answer to Plaintiff's Third Amended Complaint**, to be served upon the individuals listed below by depositing same in a U.S. mail box located at 180 N. LaSalle Street, Chicago, Illinois on March _16_, 2005 by 5:00 p.m.

Locke E. Bowman
Richard Schwartz, Law Student
MacArthur Justice Center
1111 East 60th Street
Chicago, Illinois 60637
(773) 753-4405
(773) 702-0771 (fax)

Craig B. Futterman
Mandel Legal Aid Clinic
University of Chicago Law School
6020 S. University Avenue
Chicago, Illinois
(773) 702-9611
(773) 702-2063 (fax)

George J. Yamin, Jr.
City of Chicago
Law Department
Corporation Counsel
30 North LaSalle Street
Suite 1020
Chicago, Illinois 60602
(312) 744-5100
(312) 744-6912 (fax)

*/s/ John M. Broderick*